**UNION PACIFIC RAILROAD COMPANY, a Utah corporation, Appellant (Petitioner below),**

v.

**The PUBLIC SERVICE COMMISSION OF WYOMING et al., Appellees (Respondents below).**

**No. 4254.**

Supreme Court of Wyoming.

Jan. 18, 1974.

Loomis, Lazear, Wilson & Pickett and Frederick G. Loomis, Cheyenne, for appellant.

Clarence A. Brimmer, Atty. Gen., and Richard J. Moen, Sp. Asst. Atty. Gen., Cheyenne, for appellees.

Charles E. Graves, Cheyenne, for appellee, Town of Medicine Bow.

Before PARKER, C. J., McEWAN, GUTHRIE, and McCLINTOCK, JJ., and PEARSON, District Judge (R.).

Mr. Chief Justice PARKER delivered the opinion of the court.

This is an appeal from a district court judgment affirming the Public Service Commission's order which rejected the company's petition asking to close its agency station at Medicine Bow.[1] The company presents some five reasons why the order was erroneous, which may be summarized as follows:

1. Essentially the petition was refused because the commission concluded that the evidence indicated the agency had generated a profit.

2. The commission did not fulfill its function of eliminating rather than perpetuating unnecessary expenditures.

3. The commission did not recognize that public convenience and necessity is paramount in determining whether an agency shall be closed or not and, as corollary, in the absence of public convenience and necessity, the maintenance of an agency station becomes a question of business policy with which regulatory bodies should not interfere.

4. The public convenience and necessity do not in fact demand the presence of an agent at Medicine Bow.

5. There was no substantial evidence to support the commission's statement that "the very future of the town may depend upon the continuing service by the U.P."

▮ Considering these in the order mentioned, we have in Case 4255 already indicated the weight to be given profitability, namely, that it is not controlling but merely one element to be viewed with various others. This pronouncement needs no expansion.

▮ With the second argument, that unnecessary expenditures should be eliminated by the commission, we do not disagree if we bear in mind that the word "unnecessary" is in each case a matter for the interpretation of the commission, subject to review by the courts. This concept is closely related to those advanced by the company, that public convenience and necessity are of paramount consideration and that in the absence of these an agency station need not be maintained. However, as pointed out in the Burns case (No. 4255) under the authority of Application of Chicago & North Western Railway Company, 79 Wyo. 343, 334 P.2d 519, 521, the burden of proving the lack of these is upon the carrier seeking discontinuance of the agency. The instant case turns on this aspect,

---

1. Cases 4255 and 4253 relating to similar petitions seeking the closing of agency stations at Burns and Hawk Springs were consolidated with Case 4254 for argument, and opinions disposing of these appeals are issued concurrently.

and a careful review of the record discloses that the petitioner did not carry its burden of showing that public convenience and necessity of the community do not require the agency to remain. There was considerable speculation that future business to the carrier would not be forthcoming and frequent references to past profits which were extraordinary and would not reoccur, but no evidence of a comprehensive study of the resources of the area was presented, and there is little substantiation of the bald statements that certain profitable business would be nonrecurring. Further, there was no definitive plan for substitute service in case the agency was discontinued, but merely testimony that it was the belief of the Union Pacific consultant residing at Green River that waybills would be taken to Hanna (located some twenty miles west of Medicine Bow) by train crews and processed, that with the exception of damage claims everything necessary or required to handle an incoming shipment could be handled at Hanna, and that as to outgoing shipments the Hanna agent if requested would go to Medicine Bow, bringing down a livestock contract, thirty-six hour release, car order, and waybill, while other duties relative to shipping could be handled by telephone from Hanna.

■ The company concedes that the Medicine Bow Agency with the exception of 1969 shows a profit but argues that a correct view of the profit-loss picture requires consideration of it with relation to all expenses incurred in moving freight traffic on the railroad, in other words, an operating ratio, and in that regard the Medicine Bow operation is not profitable. This circumstance and the testimony purporting to minimize the duties of the agent and the time required for each of his activities[2] cannot substitute for the es-

2. Petitioner's Exhibit 12 was prepared by its consultant residing in Green River and represented what he believed to be the average unit time (minutes per day—and in this instance fifty-one minutes) that the Medicine Bow agent spent on his various duties. The "formula" therein was never applied to other agents as a comparison to see what they do. Portions of the testimony regarding this exhibit are significant, e. g.:

"Q [to U.P. consultant] On this Exhibit 12, Mr. Miller, in your 'Average Unit Time,' you have got down ten minutes. Now, are you trying to tell us that it takes only ten minutes for an agent to go down and inspect the car before it is loaded, and after he has made this inspection he comes back and bills the car out and goes down and inspects it again to see that the lading is in the car, seals it, all of this is done in a ten-minute period? A I think it can be done. You are right, you are close, you are very close on that, yes.
"Q He must have track shoes. Down here in the 'OS&D', you show 15 minutes for an OS&D. Now, is this for the report or the inspection and the report? A It could be both, yeah.
"Q It is both. And in every case now an OS&D is a carload, it would be a carload? A Correct.
"Q Overage or shortage or damage, right? A Yes.
"Q And the 15-minute period includes all of this? This is another question that I can't hardly understand myself: How can a man go down and inspect a full carload of lading to discover what the damage is in it, and come back and make a report out in 15 minutes? A That's an average time.
"Q Looks to me like it would take 15 minutes to walk down there and back? A I don't know where we are going.
"Q Well, the car isn't in the depot, is it? A No."
"[Statement of cattle rancher and shipper from Medicine Bow stockyards:] * * * I disagree with Mr. Miller on the agent spending ten minutes to ship with a car of cattle. I have shipped for a long time, and it takes longer than that. We truck these cattle in throughout the country, and it takes part of two days to get them in here to the stockyards, and we have to have water for them. And when I order the cars I tell Mr. Lawton that we would like to have the water hoses hooked up so we can water them. And he says, 'We will have the section hands get the hoses ready.' And when we get here with the first cattle the hoses are not there, so I stop and [sic] depot and tell Mr. Lawton that the hoses aren't there, so he goes and gets the hoses and hauls them up to the stockyards and gets them to work. And then this last fall when we shipped, the morning we went to load, there was a bunch of sheep there to be loaded, too, and the buyer of the sheep didn't know yet where he wanted to ship them to, and he kept stalling around. And Mr. Lawton made a good many trips from the depot to the stockyards that morn-

sential showing previously discussed concerning the public convenience and necessity of the community. Scrutiny of the testimony and exhibits discloses a lack of substantial evidence on this vital point. The company is perhaps justified in challenging the commission's statement that "the very future of the town may depend upon the continuing service by the U.P." for lack of evidence substantiating this and in categorizing protestants' testimony concerning a plastics industry and certain coal mining in the area as speculative. Testimony to substantiate these statements, as well as some of the company's references to past profits now denominated as nonreoccurring, is lacking. While probabilities of future development is a factor to be considered, such business prospectives must be established by the evidence with reasonable certainty. Thomson v. Nebraska State Railway Commission, 143 Neb. 52, 8 N.W.2d 552, 555. It would be possible to present meaningful testimony based on careful evaluation and clear-cut arrangements as to probable future business in these areas, but speculation and casual references have little place in proceedings of this nature.

Analysis of petitioner's presentation in all facets leads us to conclude that the trial court was justified in affirming the commission's order.

Affirmed.

McCLINTOCK, J., in which PEARSON, District Judge (R.), joins, dissenting.

I dissent in this case and suggest that the proceedings should be returned to the commission with instructions to make proper and separate findings of fact and conclusions of law. My comments in cause No. 4255 (Burns) and No. 4253 (Hawk Springs) appear equally pertinent in this case.

ing trying to figure out what we was going to do. And finally it was 11:30 when everything was finally loaded and ready to go. It takes a lot more than ten minutes on each of those shipments. And then with each of these cars of cattle, there is one set of papers for each car, whether they are in the same shipment or not. I am sure it takes more than ten minutes to get all of that together."